# In the United States Court of Federal Claims
### OFFICE OF SPECIAL MASTERS
Filed: March 29, 2022

| | | |
|---|---|---|
| * * * * * * * * * * * * * * | * | |
| AUTUMN ORM, | * | |
| | * | |
| Petitioner, | * | No. 14-257V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Attorneys' Fees and Costs; Reasonable |
| AND HUMAN SERVICES, | * | Basis; Interim Award. |
| | * | |
| Respondent. | * | |
| | * | |
| * * * * * * * * * * * * * * | | |

Mark Sadaka, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for petitioner.
Debra Begley, U.S. Department of Justice, Washington, DC, for respondent.

### DECISION AWARDING INTERIM ATTORNEYS' FEES AND COSTS[1]

On April 2, 2014, Autumn Orm[2] ("petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2012)[3] alleging she developed bilateral leg weakness and myasthenia gravis following the administration of human papillomavirus ("HPV") vaccines on August 30, 2011 and November 22, 2011. Petition at Preamble (ECF No. 1).

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] This case was originally filed by petitioner's parents. During pendency of this case, petitioner reached the age of majority. Order dated Nov. 9, 2015 (ECF No. 60).

[3] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2012). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

On June 1, 2017, petitioner filed a motion for interim attorney's fees and costs, requesting compensation in the amount of $370,487.55 for the attorneys and paralegals who worked on her case, as well as $400.00 in petitioner's costs. Petitioner's Application for an Interim Award of Attorney's Fees and Costs ("Pet. Mot."), filed June 1, 2017, at 5 (ECF No. 144). Petitioner noted the diagnosis of myasthenia gravis was ruled out and updated petitioner's diagnosis to Postural Orthostatic Tachycardia Syndrome ("POTS"). Id. at 1-2. On February 28, 2018, petitioner filed an amended petition, alleging petitioner's August 30, 2011 and November 22, 2011 HPV vaccinations, caused her to suffer from Celiac disease, POTS, chronic fatigue syndrome ("CFS"), and small fiber neuropathy. Amended ("Am.") Petition at Preamble (ECF No. 172). Respondent filed a response on August 17, 2017, arguing petitioner's claim lost reasonable basis on September 16, 2017 and requesting fees after this date be deferred or denied. Respondent's ("Resp.") Response to Pet. Mot., filed Aug. 17, 2017, at 9-11 (ECF No. 156).

Petitioner filed an amended motion for interim attorneys' fees and costs on January 25, 2018, seeking $105,180.29 in attorneys' fees and costs and $400.00 in petitioner's costs, for a total of $105,580.29.[4] Pet. Am. Application for an Interim Award of Attorneys' Fees and Costs ("Pet. Am. Mot."), filed Jan. 25, 2018, at 5 (ECF No. 165). Respondent filed a response on February 9, 2018, indicating "[r]espondent is satisfied the statutory requirements for an award of attorneys' fees and costs are met in this case for expenses incurred through September 14, 2016." Resp. Response to Pet. Am. Mot., filed Feb. 9, 2018, at 2 (ECF No. 168).

Thereafter, the previous special master requested additional information from both parties. See Order dated July 5, 2018 (ECF No. 188). Petitioner filed a response to the Court's order on August 1, 2018, updating the requested amount of fees and costs to $105,896.29, including $400.00 in petitioner's costs. Pet. Status Report ("Pet. Rept."), filed Aug. 1, 2018, at 3 (ECF No. 189). On August 15, 2018, respondent filed a response, opposing an award of interim fees and costs based on a lack of reasonable basis. Resp. Response to the Special Master's July 5, 2018 Order ("Resp. Response"), filed Aug. 15, 2018 (ECF No. 193). Petitioner filed a reply on August 22, 2018. Pet. Reply to Resp. Response ("Pet. Reply"), filed Aug. 22, 2018 (ECF No. 195).

The previous special master denied petitioner's motion for interim attorneys' fees and costs on May 21, 2019. Decision Denying Attorneys' Fees and Costs on an Interim Basis ("Decision") dated May 21, 2019 (ECF No. 203). The special master declined the award at that time and informed petitioner she could renew her motion at a later time. Id. at 6. This case was recently reassigned to the undersigned and the motion was renewed.

For the reasons discussed below, the undersigned **GRANTS IN PART** petitioner's motion and awards **$104,789.57** in attorneys' fees and costs and **$400.00** in petitioner's costs.

---

[4] To expedite an award of some of the attorneys' fees and costs, petitioner was directed to file an amended application that did not include any attorneys' fees or costs incurred after September 14, 2016, resulting in the lower amount requested. Order dated Dec. 13, 2017 (ECF No. 164).

I.  BACKGROUND

   A.  **Procedural History**

Petitioner filed her petition on April 2, 2014, followed by medical records on May 2, 2014.  Petition; Pet. Exhibits ("Exs.") 1-11.  Petitioner filed additional medical records and a damages affidavit in July 2014.  Pet. Exs. 12-15.  On August 7, 2014, respondent filed a Rule 4(c) Report, arguing against compensation, stating "this case is not appropriate for compensation under the terms of the Act."  Resp. Rept. at 1 (ECF No. 16).

Petitioner filed affidavits from her former coaches on October 23, 2014.  Pet. Exs. 16-19.  Petitioner filed additional medical records and an expert report[5] from Dr. Svetlana Blitshteyn in February 2015.  Pet. Exs. 20-30.  Respondent filed a responsive expert report from Dr. Eric Lancaster on May 26, 2015.  Resp. Ex. A.  Thereafter, petitioner filed additional medical records and expert reports from Dr. Blitshteyn.  Pet. Exs. 31-35.  Respondent filed a supplemental report from Dr. Lancaster on October 15, 2015.  Resp. Ex. B.

The case was scheduled for a fact hearing on September 16, 2016 and an entitlement hearing on October 6, 2016.  Order for Submissions in Preparation for the Hearing dated Mar. 24, 2016 (ECF No. 63); Order dated Aug. 23, 2016 (ECF No. 83).  In preparation for the hearing, petitioner filed affidavits, medical records, and medical articles from July to September 2016, and respondent filed a supplemental expert report from Dr. Lancaster on August 29, 2016.  Pet. Exs. 36-76; Resp. Ex. C.

A fact hearing was held on September 16, 2016.  Order dated Sept. 19, 2016 (ECF No. 100).  Thereafter, petitioner filed medical records and expert reports from Dr. Blitshteyn and respondent filed an expert report from Dr. Lancaster.  Pet. Exs. 77-81; Resp. Ex. E.  During a status conference on September 29, 2016, petitioner represented that she wanted to change her medical theory and find a new expert to opine in this case.  Order dated Sept. 30, 2016 (ECF No. 108).  The entitlement hearing set for October 2016 was cancelled.  Id. at 1.

Petitioner filed additional medical records in October 2016 and respondent filed articles referenced during the fact hearing on November 1, 2016.  Pet. Exs. 82-85; Resp. Exs. H-S.  Petitioner filed a new expert report from Dr. Aaron Lerner on January 26, 2017 and medical records on February 7, 2017.  Pet. Exs. 88-89.  Respondent filed a responsive report from Dr. Chris Liacouras on April 10, 2017.  Resp. Ex. T.  Petitioner filed medical records and a rebuttal report from Dr. Lerner in April 2017 and July 2017.  Pet. Exs. 149-50.

On June 1, 2017, petitioner filed a motion to substitute her attorney and a motion for interim attorneys' fees and costs, seeking $370,887.55.  Pet. Mot. to Substitute or Change Attorney of Record, filed June 1, 2017 (ECF No. 143); Pet. Mot. at 5.  Status conferences regarding petitioner's interim fees and costs motion were held on July 12, 2017 and August 10, 2017.

---

[5] Petitioner filed a revised expert report adding citations in May 2015.  See Pet. Ex. 30.

Thereafter, respondent filed a response on August 17, 2017, arguing that petitioner lost reasonable basis for her claim on September 14, 2016. Resp. Response to Pet. Mot. at 9-11. Respondent filed an additional response to the special master's order regarding respondent's role in the resolution of attorneys' fees and costs. Resp. Response to the Court's June 12, 2017 and July 19, 2017 Orders, filed Aug. 25, 2017 (ECF No. 157). Meanwhile, petitioner maintained that her claim was supported by a reasonable basis. Pet. Reply to Resp. Response to Pet. Mot., filed Sept. 11, 2017 (ECF No. 158).

To resolve the dispute over reasonable basis, petitioner was ordered to file a renewed motion that did not include any attorneys' fees or costs incurred after September 14, 2016. Order dated Dec. 13, 2017 (ECF No. 164). Petitioner filed her amended motion on January 25, 2018, requesting the reduced amount of $105,580.29. Pet. Am. Mot. Respondent filed a response on February 9, 2018 indicating "[r]espondent is satisfied the statutory requirements for an award of attorneys' fees and costs are met in this case for expenses incurred through September 14, 2016." Resp. Response to Pet. Am. Mot. at 2.

An order was issued on July 5, 2018, requesting additional information from the parties. Order dated July 5, 2018. In response, petitioner filed a status report on August 1, 2018, as well as an expert report from Dr. Yehuda Shoenfeld on August 2, 2018. Pet. Rept.; Pet. Ex. 320. Respondent filed his response on August 15, 2018, where respondent changed his position and argued petitioner never had a reasonable basis, even prior to September 14, 2016. Resp. Response. Petitioner filed a reply on August 22, 2018. Pet. Reply. In November 2018, petitioner filed an expert report from Dr. Shoenfeld and a consented motion to substitute Mark Sadaka as the attorney of record for petitioner. Pet. Ex. 321; Consented Mot. to Substitute Attorney of Record, filed Nov. 26, 2018 (ECF No. 197).

On May 21, 2019, the previous special master issued a decision denying petitioner's motion for interim attorneys' fees and costs. Decision at 6. In denying the award, the special master declined ruling on reasonable basis until both parties have had the opportunity to fully clarify their underlying arguments. Id. at 5-6. The special master did not rule on petitioner's eligibility for an interim award of fees and costs, only using his discretion to decline the award at that time, informing petitioner she could renew her motion at a later time. Id. at 6.

This case was assigned to the undersigned on December 8, 2021. Notice of Reassignment dated Dec. 8, 2021 (ECF No. 285). The undersigned held a status conference on December 21, 2021. Order dated Dec. 21, 2021 (ECF No. 286). The parties discussed the pending request for interim attorney's fees and costs and petitioner orally renewed the request. See id. at 1.

This matter is ripe for adjudication.

4

B.      **Abbreviated Summary of Medical Records**[6]

Petitioner was 13 years old when she received her first dose of the HPV vaccine on August 30, 2011. Pet. Ex. 12 at 2. Her past medical history was relatively unremarkable, but on that visit, she complained to her primary care physician of pain while running. Id. Her pediatrician noted scoliosis and nevi on her buttock and posterior leg, with an assessment of bilateral iliac crest pain that was probably musculoskeletal. Id. She received the first dose of the HPV vaccine after the assessment and was referred to dermatology and instructed to repeat the scoliosis X-rays. Id.

On November 22, 2011, petitioner received her second dose of the HPV vaccine at 14 years old. Pet. Ex. 2 at 1. More than a month later, on January 5, 2012, petitioner presented to her pediatrician, complaining of shortness of breath when exercising. Pet. Ex. 14 at 3. Less than a week later, on January 10, 2012, petitioner presented to gastroenterologist, Dr. Sachine Kunde for abdominal pain, fatigue, and diarrhea. Pet. Ex. 4 at 1, 11, 13-19. The examination revealed no abnormalities, except for chronic gastritis and focal active colitis in the large intestines. Id. at 19. On January 11, 2012, petitioner underwent a colonoscopy and endoscopy to determine whether she suffered from celiac disease or Crohn's disease. Id. at 36.

Petitioner presented for an evaluation of a wart on August 13, 2012, and reported that she suffered from celiac disease. Pet. Ex. 14 at 2. She reported feeling lethargic, short of breath, and tired, while also feeling easily angered or irritated. Id. Her pediatrician assessed that she had a plantar wart, celiac disease, and "depression related to chronic disease." Id. A few months later, on November 27, 2012, petitioner again presented to her primary care physician for an evaluation of left knee pain, reporting difficulty with certain leg movements and occasional swelling in her leg. Id. at 1.

On February 11, 2013, petitioner was seen for bilateral pain and weakness in her quadriceps. Pet. Ex. 5 at 125. Her pediatrician's assessment was that she continued to suffer from iron deficiency, celiac disease, and bilateral leg pain and weakness. Id. A serology test on February 14, 2013, came back positive for antinuclear antibodies ("ANA").[7] Id. at 152.

Lab results from petitioner's arterial duplex studies performed on March 20, 2013, came back normal. Pet. Ex. 5 at 132. Her echocardiogram and electromyography/nerve conduction study ("EMG/NCS") performed on May 1, 2013 also came back normal, with no evidence of myopathy, peripheral neuropathy, lumbar radiculopathy, or nerve injury. Id. at 122-23, 161-62; Pet. Ex. 7. An ultrasound of her bilateral lower extremity venous system on August 5, 2013 was also normal. Pet. Ex. 6.

---

[6] Although the undersigned has reviewed all of the medical records and other evidence in this case, for purposes of efficiency, this history is largely taken from respondent's Rule 4(c) Report. For a more detailed factual history, see Resp. Rept. at 1-13.

[7] ANA are "antibodies directed against nuclear antigens" in one's own body. Antinuclear Antibodies, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=56804 (last visited Mar. 22, 2022).

Petitioner presented to the Pediatric Rheumatology Clinic on August 14, 2013, reporting a two-year history of muscle weakness in her upper thighs and arms, and shortness of breath following exertion. Pet. Ex. 5 at 182. Her rheumatology evaluation revealed positive ANA and an acetylcholine receptor ("AchR") antibody level of 0.05 (normal level is less than 0.05). Id. at 184. As a result, she was diagnosed with myasthenia gravis[8] and inherited myopathies. Id. at 185.

Two days later, on August 16, 2013, petitioner presented to pediatric neurologist, Dr. Sindhu Ramchandren, again reporting shortness of breath with exertion for the past two-to-three years. Pet. Ex. 5 at 193. Dr. Ramchandren stated that myasthenia gravis could explain her symptoms, but suggested other etiologies could as well, such as metabolic myopathy or periodic paralysis syndrome. Id. at 195. Petitioner sought a second opinion from neurologist, Dr. Duygu Selcen, on September 25 and 26, 2014. Pet. Ex. 8. Dr. Selcen doubted a myasthenia gravis diagnosis based on petitioner's normal EMGs. Id. at 9.

On October 18, 2013, petitioner returned to the rheumatology clinic and reported experiencing progressive symptoms. Pet. Ex. 5 at 227-40. The rheumatologist's impression was that her progressive weakness with exertion was "concerning for an underlying congenital or metabolic myopathy including myasthenia gravis." Id. at 109. The same day, Dr. Ramchandren indicated a possibility of myasthenia gravis and possibly initiating IVIG for the myasthenia weakness. Id. at 227, 239. Petitioner was admitted to the University of Michigan Hospital and Health Centers for IVIG treatment on November 15, 2013, due to worsening symptoms, including difficulty swallowing. Id. at 6-9, 12-13, 25-26, 32-33, 56-60. She received two doses of IVIG over two days and was diagnosed with weakness, myasthenia gravis-AchR antibody positive, headache, and celiac disease upon discharge on November 19, 2013. Id. at 8-9.

Petitioner had a follow-up with Dr. Ramchandren on December 6, 2013, where she reported some improvement in her endurance since the IVIG therapy. Pet. Ex. 5 at 278-80. Her examination on that visit was normal, and Dr. Ramchandren's impression was myasthenia gravis. Id. at 279-80. Dr. Ramchandren planned to start petitioner on Prednisone and to continue her physical therapy. Id. On January 23, 2014, petitioner was again seen by Dr. Ramchandren, asserting that her prescribed steroid treatment had not changed her strength or endurance and reporting continued weakness in her legs and arms, and difficulty swallowing with slurred speech. Id. at 303-05. She received a second course of IVIG and was scheduled to receive IVIG every 8 weeks for the next 6 months. Id. at 65.

---

[8] Myasthenia gravis is "an autoimmune disease of neuromuscular function due to the presence of antibodies to [AchR] at the neuromuscular junction; characteristics include muscle fatigue and exhaustion that fluctuates in severity, without sensory disturbance or atrophy." Myasthenia Gravis, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=91080 (last visited Mar. 22, 2022). Additionally, myasthenia gravis "may be restricted to one muscle group or become generalized with severe weakness and sometimes respiratory insufficiency," and "[i]t may affect any muscle of the body, but especially muscles of the eyes, face, lips, tongue, throat, and neck." Id.

On March 21, 2014, petitioner presented to immunologist-hematologist, Dr. Laurence Boxer, for an evaluation of her underlying immune dysregulation. Pet. Ex. 13 at 51-55. Dr. Boxer noted that petitioner's anti-AchR antibodies were now zero, and that her symptoms did not fit the typical myasthenia gravis picture. Id. at 53. He suggested autoimmune or immune dysregulation, and conversion disorder etiologies. Id. at 74-78.

Ultimately, the diagnosis of myasthenia gravis was ruled out, and petitioner was diagnosed with POTS,[9] CFS,[10] celiac disease,[11] and small fiber neuropathy[12] based on her symptoms. See Pet. Exs. 30, 88, 150, 320.

## II. BRIEF SUMMARY OF PETITIONER'S EXPERTS' REPORTS

### A. Dr. Svetlana Blitshteyn

Dr. Blitshteyn is a board-certified neurologist, licensed to practice medicine in New York State, who serves as Clinical Assistant Professor of Neurology at the State University of New York. Pet. Ex. 29 at 1; Pet. Ex. 30 at 1. She has specialized in autonomic disorders, founding the Dysautonomia Clinic and publishing several peer-reviewed papers on autonomic disorders, including a book titled "POTS: Together We Stand." Pet. Ex. 30 at 1.

Dr. Blitshteyn opined that petitioner's leg weakness and shortness of breath, which manifested during her participation in athletic events, could be due to complications of undiagnosed celiac disease. Pet. Ex. 30 at 4. However, Dr. Blitshteyn then cited petitioner's continued problems after the celiac disease diagnosis as an indication that she was suffering from

---

[9] POTS is "a group of symptoms (not including hypotension) that sometimes occur when a person assumes an upright position, including tachycardia, tremulousness, lightheadedness, sweating and hyperventilation." Postural Orthostatic Tachycardia Syndrome, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=111236 (last visited Mar. 22, 2022).

[10] CFS is "persistent debilitating fatigue lasting longer than 6 months, with other known medical conditions having been ruled out by clinical diagnosis, accompanied by at least four of the following: significantly impaired short-term memory or concentration, muscle weakness, pain in multiple joints without swelling or redness, sore throat, tender lymph nodes, headaches, unrefreshing sleep, and malaise that lasts more than 24 hours following exertion." Chronic Fatigue Syndrome, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=110414 (last visited Mar. 22, 2022).

[11] Celiac disease is "an autoimmune malabsorption syndrome precipitated by ingestion of gluten-containing foods." Celiac Disease, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=70171 (last visited Mar. 22, 2022).

[12] Small fiber neuropathy is "a type of neuropathy in which only the small sensory cutaneous nerves are affected." Small Fiber Neuropathy, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=137479 (last visited Mar. 22, 2022).

POTS as well.  Id.  In support, Dr. Blitshteyn presented a molecular mimicry theory to explain how the HPV vaccinations could have caused both POTS and celiac disease.  Id. at 6-7.

Petitioner initially relied on the opinion of Dr. Blitshteyn to support her POTS diagnosis.  However, in September 2016, petitioner became aware of a medical article suggesting that celiac disease could cause POTS, which led Dr. Blitshteyn to withdraw her theory of causation.  Pet. Status Rept., filed Nov. 3, 2016 (ECF No. 118).  Although she was unable to provide expert testimony as to the causation of petitioner's POTS, Dr. Blitshteyn maintained her willingness and ability to testify as to petitioner's diagnosis.  Id.

### B.      Dr. Aaron Lerner

Dr. Lerner is a certified gastroenterologist who has previously served as head of pediatric gastroenterology and nutrition at the Carmel Medical Center in Haifa, Israel.  Pet. Ex. 88 at 1.  He has cared for thousands of celiac disease patients over 35 years and is scientific founder of two major serological biomarkers of celiac disease: anti-endomysial and anti-neo-epitope tissue transglutaminase.  Id.

In his reports, Dr. Lerner reemphasized the celiac disease diagnosis, noting that petitioner's athletic decline started after the first HPV vaccination, and that all of her subsequent symptoms were associated with celiac disease.  Pet. Ex. 88 at 23-24.  Dr. Lerner cited studies describing a higher incidence of celiac disease post-HPV vaccine, and suggested several mechanistic pathways relating the HPV vaccine to celiac disease induction.  Id.  Although Dr. Lerner conceded that many post-HPV vaccine surveys were unreliable due to conflicting interests, along with the hypo-symptomatic nature of clinical celiac disease, he maintained this actually led to an underestimation of celiac disease and that petitioner's diagnosis was directly connected to the vaccine in a cause and effect relationship.  Pet. Ex. 150 at 9.

### C.      Dr. Yehuda Shoenfeld

Dr. Shoenfeld is an expert in autoimmune/rheumatic diseases.  Pet. Ex. 320 at 1.  He founded and served as director of the Center for Autoimmune Diseases at the Sheba Medical Center in Israel.  Id.  He has published more than 2,000 peer reviewed papers on vaccinations and autoimmunity, has written more than 300 chapters in medical books, and has served as Emeritus Professor of the Sackler School of Medicine at Tel-Aviv University.  Id.

Dr. Shoenfeld detailed POTS, celiac disease, CFS, and small fiber neuropathy, and offered examples of patients receiving the HPV vaccine and presenting with POTS/CFS within a few months.  Pet. Ex. 320 at 2-6.  Dr. Shoenfeld reemphasized how petitioner's clinical manifestations of celiac disease and POTS emerged after her HPV vaccinations, along with the ANA antibodies.  Id. at 5.  He opined several mechanisms, including molecular mimicry, epitope spreading, bystander activation, or reactions to the adjuvant used in the vaccination, could have caused petitioner's diagnoses in response to the cross-reactive peptide in the HPV vaccine.  Id. at 2-3, 12-16.

III.   PARTIES' CONTENTIONS

   A.   Petitioner's Contentions

Petitioner maintains her claim was brought in good faith and with reasonable basis, pursuant to the statutory requirements for the filing of claims in the Vaccine Program. Pet. Am. Mot. at 4. Petitioner believes the HPV vaccine caused her illnesses and filed an affidavit attesting to her belief. Pet. Ex. 3. Petitioner argues her claim that the HPV vaccinations caused her POTS, CFS, celiac disease, and small fiber neuropathy is supported by the medical records, medical literature, temporal relationship between the vaccinations and illnesses, and expert opinions from Dr. Lerner and Dr. Shoenfeld. Id. at 4; Pet. Reply at 2-5. Petitioner further contends that the expert reports cite to hundreds of sources, which provides credible evidence for the acute presentation of her injuries after vaccinations, a plausible theory of causation, and a plausible timeframe between the vaccinations and injuries. Pet. Reply at 3, 5. Petitioner concedes that this evidence may not meet the standard for establishing causation, but believes that it "is more than enough" to establish a reasonable basis. Id. at 4.

Additionally, petitioner argues that she will face an undue hardship if interim fees and costs are not awarded, as this matter has been protracted for many years and petitioner's counsel has incurred fees and costs exceeding $100,000.00. Pet. Am. Mot. at 4. Petitioner's former counsel's firm is small, and she contends that the interim fee request is necessary to the well-being of the firm. Id. According to petitioner, the unique circumstances of attorney Mark Krueger's passing[13] exacerbated these fees and costs by petitioner's former counsel, further necessitating an interim fee award. Id.

As to the amount requested, petitioner disagrees with respondent that there was duplicative work between the attorneys, arguing that attorneys Mark Krueger and Andrew Krueger worked as a team. Pet. Reply at 5. Petitioner also notes that her first expert, Dr. Blitshteyn, already incorporated her retainer fee into the calculation for fees and costs. Id. As such, petitioner does not revise the amount requested in her amended motion. Id. at 5-6.

   B.   Respondent's Contentions

Respondent argues that petitioner is not entitled to any attorneys' fees and costs because "[t]he objective evidence in the record simply does not support that the claim has a reasonable basis." Resp. Response at 10. Respondent relies on Simmons v. Secretary of Health & Human Services, 875 F.3d 632 (2017), stating that "Simmons makes clear that a claim cannot have a reasonable basis and then lose it during the pendency of the claim." Resp. Response at 7. Given this, respondent contends that when petitioner's initial expert, Dr. Blitshteyn, rescinded her opinion that the HPV vaccine caused petitioner's injuries, petitioner lost any reasonable basis to her claim. Id. at 10. According to respondent, even the expert reports filed after September 14, 2016 do not satisfy the "required elements of petitioner's prima facie case under Althen, and do not provide any support for the claim's alleged reasonable basis." Id. at 10-11. Respondent

---

[13] Attorney Mark Krueger passed away in May 2017. Pet. Mot. to Substitute or Change Attorney of Record, filed June 1, 2017 (ECF No. 143).

concedes that special masters have permitted limited awards of attorneys' fees and costs when a claim initially had but then lost reasonable basis in the past, but argues that those cases misapplied controlling case law. Id. at 9 (citing Chuisano v. Sec'y of Health & Hum. Servs., 116 Fed. Cl. 276, 288-89 (2014) as an example of a case that misapplied Perreira v. Sec'y of Health & Hum. Servs., 33 F.3d 1375 (Fed. Cir. 1994)).

As to the amount requested, respondent maintains that fees for the performance of administrative tasks should not be compensated and that there was "substantial duplication" of work between attorneys Andrew Krueger and Mark Krueger. Resp. Response at 12-13. Respondent also questions whether petitioner has reduced the total amount sought for Dr. Blitshteyn by her $2,000.00 retainer, as well as the reasonableness of billing over $20,000.00 by an expert in POTS who ultimately determined that she could not support the claim. Id. at 13-14. Otherwise, respondent does not raise arguments against any other fees and costs the court may determine are warranted. Id. at 13.

## IV. DISCUSSION

Under the Vaccine Act, the special master shall award reasonable attorneys' fees and costs for any petition that results in an award of compensation. § 15(e)(1). When compensation is not awarded, the special master "may" award reasonable fees and costs "if the special master or court determines that the petition was brought in good faith and there was a reasonable basis for the claim for which the petition was brought." Id. If a special master has not yet determined entitlement, she may still award attorneys' fees and costs on an interim basis. Avera v. Sec'y of Health & Hum. Servs., 515 F.3d 1343, 1352 (Fed. Cir. 2008). Such awards "are particularly appropriate in cases where proceedings are protracted and costly experts must be retained." Id. Similarly, it is proper for a special master to award interim fees and costs "[w]here the claimant establishes that the cost of litigation has imposed an undue hardship and that there exists a good faith basis for the claim." Shaw v. Sec'y of Health & Hum. Servs., 609 F.3d 1372, 1375 (Fed. Cir. 2010).

"Good faith" is a subjective standard. Hamrick v. Sec'y of Health & Hum. Servs., No. 99-683V, 2007 WL 4793152, at *3 (Fed. Cl. Spec. Mstr. Nov. 19, 2007). A petitioner acts in "good faith" if he or she holds an honest belief that a vaccine injury occurred. Turner v. Sec'y of Health & Hum. Servs., No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). The standard for finding good faith has been described as "very low," and findings that a petition lacked good faith are rare. Heath v. Sec'y of Health & Hum. Servs., No. 08-86V, 2011 WL 4433646, at *2 (Fed. Cl. Spec. Mstr. Aug. 25, 2011).

"Reasonable basis," however, is an objective standard. Unlike the good faith inquiry, reasonable basis requires more than just petitioner's belief in her claim. See Turner, 2007 WL 4410030, at *6. Instead, a reasonable basis analysis "may include an examination of a number of objective factors, such as the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." Amankwaa v. Sec'y of Health & Hum. Servs., 138 Fed. Cl. 282, 289 (2018); accord Cottingham v. Sec'y of Health & Hum. Servs., 971 F.3d 1337 (Fed. Cir. 2020). "More than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." Cottingham, 971 F.3d at 1346. However, expert testimony in and of itself does not

determine reasonableness.  Frantz v. Sec'y of Health & Hum. Servs., 146 Fed. Cl. 137, 143 (2019); accord Murphy v. Sec'y of Health & Hum. Servs., 30 Fed. Cl. 60, 62 (1993).

## V.     ANALYSIS

The claim appears at this point to have been brought in good faith and built on a reasonable basis.  Moreover, the undersigned finds that an award of interim attorneys' fees and costs is appropriate here where there are significant expert fees to be paid and the matter has been protracted for several years.

### A.     Reasonable Basis

In discussing the reasonable basis requirement in Cottingham, which involved similar allegations relating to the HPV vaccine, the Federal Circuit stressed the prima facie petition requirements of § 11(c)(1) of the Act.  971 F.3d at 1345-46.  Specifically, the petition must be accompanied by an affidavit and supporting documentation showing that the vaccinee:

   (1) received a vaccine listed on the Vaccine Injury Table;

   (2) received the vaccination in the United States, or under certain stated circumstances outside of the United States;

   (3) sustained (or had significantly aggravated) an injury as set forth in the Vaccine Injury Table (42 C.F.R. § 100.3(e)) or that was caused by the vaccine;

   (4) experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and

   (5) has not previously collected an award or settlement of a civil action for damages for the same injury.

Id. (quoting § 11(c)(1)).

Consistent with the above, petitioner has filed contemporaneous and facially trustworthy medical records demonstrating (1) that petitioner received a covered vaccine; (2) that the vaccine was administered in the United States; (3) that petitioner experienced the symptoms she alleges to constitute a vaccine-caused injury, including POTS, CFS, celiac disease, and small fiber neuropathy; and (4) that these symptoms persisted for at least six months.  Petitioner has also averred that there has been no award or settlement of a civil action for damages for the same injury.  Am. Petition at 5.

The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis."  Cottingham, 971 F.3d at 1346 (finding petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); see also James-Cornelius ex rel. E.J. v. Sec'y of Health & Hum. Servs., 984 F.3d 1374, 1380 (Fed. Cir. 2021) (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis").  Here, based on the medical records and expert reports, petitioner

11

has provided more than a scintilla of evidence to support her claims and this request for fees and costs.

Both petitioner and respondent acknowledge that before her vaccinations, petitioner's medical history included a diagnosis of scoliosis but was otherwise unremarkable. Pet. Supplemental Brief, filed May 7, 2021 at 1 (ECF No. 265); Resp. Prehearing Memorandum, filed Sept. 21, 2021, at 2 (ECF No. 273). Petitioner's medical records then indicate that after her second HPV vaccination on November 22, 2011, she presented to her pediatrician on January 5, 2012, for shortness of breath when exercising. Pet. Ex. 14 at 3. On January 10, 2012, petitioner met with gastroenterologist Dr. Kunde who determined the presence of chronic gastritis and focal active colitis in her large intestines. Pet. Ex. 4 at 19. By August 13, 2012, petitioner was diagnosed with celiac disease. Pet. Ex. 14 at 2.

Petitioner then met with neurologist Dr. Ramchandren on August 16, 2013, complaining of shortness of breath with exertion over the past two-to-three years. Pet. Ex. 5 at 193. In that visit, Dr. Ramchandren suggested myasthenia gravis as a diagnosis. Id. at 195. Petitioner's diagnosis eventually evolved into POTS, CFS, celiac disease, and small fiber neuropathy, based on the expert reports from Dr. Blitshteyn before September 14, 2016, and Drs. Lerner and Shoenfeld after that date. See Pet. Exs. 30, 88, 150, 320. Drs. Lerner and Shoenfeld cited several studies and examples showing an association between petitioner's diagnoses and the HPV vaccine, and both offered mechanistic pathways relating to the HPV vaccine and the diagnoses.

For these reasons, the undersigned finds that a reasonable basis exists to support petitioners request for an interim award of attorneys' fees and costs.

## VI. REASONABLE ATTORNEYS' FEES AND COSTS

### A. Reasonable Attorneys' Fees[14]

The Federal Circuit has approved use of the lodestar approach to determine reasonable attorneys' fees and costs under the Vaccine Act. Avera, 515 F.3d at 1349. Using the lodestar approach, a court first determines "an initial estimate of a reasonable attorneys' fee by 'multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.'" Id. at 1347–48 (quoting Blum v. Stenson, 465 U.S. 886, 888 (1984)). Then, the court may make an upward or downward departure from the initial calculation of the fee award based on other specific findings. Id. at 1348.

Counsel must submit fee requests that include contemporaneous and specific billing records indicating the service performed, the number of hours expended on the service, and the name of the person performing the service. See Savin v. Sec'y of Health & Hum. Servs., 85 Fed. Cl. 313, 316–18 (2008). Counsel should not include in their fee requests hours that are "excessive, redundant, or otherwise unnecessary." Saxton v. Sec'y of Health & Hum. Servs., 3

---

[14] The fees discussed below reflect the corrected hours and values from petitioner's status report filed on August 1, 2018. See Pet. Rept., Tab 1.

12

F.3d 1517, 1521 (Fed. Cir. 1993) (quoting Hensley v. Eckerhart, 461 U.S. 424, 434 (1983)).  It is "well within the special master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done."  Id. at 1522.  Furthermore, the special master may reduce a fee request sua sponte, apart from objections raised by respondent and without providing petitioner notice and opportunity to respond.  See Sabella v. Sec'y of Health & Hum. Servs., 86 Fed. Cl. 201, 209 (2009).  A special master need not engaged in a line-by-line analysis of petitioner's fee application when reducing fees.  Broekelschen v. Sec'y of Health & Hum. Servs., 102 Fed. Cl. 719, 729 (2011).

        1.        **Hourly Rates**

Here, petitioner requests the following hourly rates for the attorneys and paralegal from her former firm who worked on this matter:

**Mark L. Krueger – Attorney**
    2014: $300.00
    2015: $350.00
    2016: $363.00

**Andrew M. Krueger – Attorney**
    2015-2016: $200.00

**Renee Nehring – Paralegal**
    2014: $125.00
    2015: $135.00
    2016: $140.00

The undersigned finds that the requested rates are reasonable and in accordance with what these attorneys and paralegal have previously been awarded for their Vaccine Program work.  See, e.g., Herrera v. Sec'y of Health & Hum. Servs., No. 15-651V, 2017 WL 1459002, at *3 (Fed. Cl. Spec. Mstr. Mar. 29, 2017); Rivera v. Sec'y of Health & Hum. Servs., No. 15-487V, 2017 WL 2460690, at *3-4 (Fed. Cl. Spec. Mstr. Apr. 20, 2017); O'Neal v. Sec'y of Health & Hum. Servs., No. 16-122V, 2017 WL 4173720, at *3 (Fed. Cl. Spec. Mstr. Aug. 7, 2017); Stippich v. Sec'y of Health & Hum. Servs., No. 16-1595V, 2018 WL 7049403, at *1 (Fed. Cl. Spec. Mstr. Dec. 7, 2018).  The undersigned will therefore award the rates requested.

        2.        **Reduction of Billable Hours**

It is well established that billing for clerical and other secretarial work is not permitted in the Vaccine Program.  See, e.g., Rochester v. United States, 18 Cl. Ct. 379, 387 (1989) (legal assistant services that were "primarily of a secretarial and clerical nature . . . should be considered as normal overhead office costs included with the attorneys' fee rates").  Clerical and secretarial work includes tasks such as making travel arrangements, setting up meetings, and reviewing invoices.  See Raymon v. Sec'y of Health & Hum. Servs., No. 11-654V, 2016 WL 7212323 at *10 (Fed. Cl. Spec. Mstr. Nov. 2, 2016); Mostovoy v. Sec'y of Health & Hum. Servs., No. 02-10V, 2016 WL 720969, at *5 (Fed. Cl. Spec. Mstr. Feb. 4, 2016).

Upon review of the submitted billing records, the undersigned has determined that a reduction in the hours billed is appropriate because various entries bill for administrative tasks and/or constitute block billing.

For example, Ms. Nehring block billed 0.4 hours for "[d]ocket statute of limitations – file medical records," 1.5 hours for "[d]raft and file notice of filing medical records; . . . draft and file Statement of Completion," and 0.6 hours for "[d]raft and E-file supplemental expert report;" 0.6 hours for "[d]raft and E-File Status Report." Ms. Nehring also billed 0.5 hours for "[p]rint all e-mails from client regarding medical condition and e-mail to Dr. Steinman regarding same," which contains a noncompensable administrative task as well as a compensable task. Likewise, in a block billing entry for 3.4 hours, Mr. Mark Krueger billed for "search for lodging for meeting with clients and video testimony." Filing documents and searching for hotels or locations for meetings constitutes administrative tasks that are not compensable.

Further, some of these entries constitute block or double billing and/or contain noncompensable administrative tasks as described above. While these block billing entries have elements that are compensable, it is impossible determine how much time was expended to each individual task in each entry. Thus, the undersigned will deduct these entries[15] by 10%, resulting in a deduction of $706.72.

B.   **Reasonable Costs**

1.   **Expert Fees**

Petitioner requests $23,800.00 for work performed by Dr. Svetlana Blitshteyn, a total of 59.5 hours up to September 10, 2016,[16] billed at an hourly rate of $400.00. Pet. Am. Mot., Tab 2. The total includes a $2,000.00 retainer fee. Id.

Dr. Blitshteyn has previously been awarded $400.00 per hour for her vaccine program work. See, e.g., Turkupolis v. Sec'y of Health & Hum. Servs., No. 10-351V, 2015 WL 393343, at *8 (Fed. Cl. Spec. Mstr. Jan. 9, 2015); Barry v. Sec'y of Health & Hum. Servs., No. 12-039V, 2016 WL 6835542, at *9 (Fed. Cl. Spec. Mstr. Feb. 9, 2017); Carey v. Sec'y of Health & Hum. Servs., No. 16-828V, 2018 WL 1559805, at *7 (Fed. Cl. Spec. Mstr. Feb. 26, 2018). The undersigned agrees with the reasoning set forth in these prior decisions. Therefore, the undersigned finds the hourly rate appropriate and will award the requested fee in full.

---

[15] The entries listed above are examples and do not constitute an exhaustive list.

[16] The undersigned notes that Dr. Blitshteyn's invoice includes an additional 10 hours of work from September 20, 2016 to October 4, 2016. See Pet. Am. Mot., Tab 2. However, consistent with the order requiring the omission of any fees and costs incurred after September 14, 2016, those hours are not listed here. See Order dated Dec. 13, 2017.

      **2.**      **Miscellaneous Costs**

Petitioner requests $1,001.69 to cover her former firm's expenses for copies, postage, and travel. Pet. Am. Mot., Tab 2. Petitioner also requests $400.00, paid directly to her, to cover the filing fee she personally paid. Pet. Am. Mot. at 5; Pet. Am. Mot., Tab 3. The undersigned finds these costs reasonable and will award them in full.

**VII.**    **CONCLUSION**

Based on all of the above, the undersigned finds that it is reasonable to compensate petitioner and her former firm as follows:

| | |
|---|---|
| Requested Attorneys' Fees: | $ 80,694.60 |
| Reduction of Attorneys' Fees: | - ($ 706.72) |
| Awarded Attorneys' Fees: | $ 79,987.88 |
| Requested Attorneys' Costs: | $ 24,801.69 |
| Awarded Attorneys' Costs: | $ 24,801.69 |
| **Total Interim Attorneys' Fees and Costs:** | **$ 104,789.57** |
| Requested Petitioner's Costs: | $ 400.00 |
| Awarded Petitioner's Costs: | $ 400.00 |
| **Total Interim Petitioner's Costs:** | **$ 400.00** |

**Accordingly, the undersigned awards:**

    **(1) A lump sum in the amount of $104,789.57, representing reimbursement for reasonable interim attorneys' fees and costs, in the form of a check payable jointly to petitioner and petitioner's former firm, Krueger & Hernandez SC.**

    **(2) A lump sum in the amount of $400.00, representing reimbursement for filing fee costs, in the form of a check payable to petitioner.**

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this Decision.[17]

    **IT IS SO ORDERED.**

                                              **/s/ Nora Beth Dorsey**
                                              Nora Beth Dorsey
                                              Special Master

---

[17] Pursuant to Vaccine Rule 11(a), entry of judgment is expedited by the parties' joint filing of notice renouncing the right to seek review.